IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

SHANICE SMITH,
*Plaintiff*                                                        CASE NO.:

v.

CITY OF HARTFORD,
CECELIA DRAYTON
*Defendants*                                                    JURY TRIAL DEMANDED

## COMPLAINT

NOW COMES Plaintiff, Shanice Smith, by and through undersigned counsel, and brings this action against Defendants City of Hartford (the "City") and Cecelia Drayton. Plaintiff seeks redress for retaliatory termination and other unlawful adverse treatment arising from her opposition to, and reporting of, suspected misuse and misreporting of federally funded grant monies and related municipal misconduct.

## JURISDICTION AND VENUE:

1. This Court has subject matter jurisdiction over Plaintiff's federal claim pursuant to 28 U.S.C. § 1331 because Count One arises under the False Claims Act's anti-retaliation provision, 31 U.S.C. § 3730(h). The Court has supplemental jurisdiction over Plaintiff's related state-law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy.

2. Venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391 because the events giving rise to this action occurred in Hartford, Connecticut, and Defendants reside or maintain their principal offices in this District.

1

3. Plaintiff demands trial by jury on all issues so triable. A jury demand must appear in the pleading itself; a civil cover sheet alone is insufficient in this District.

## **PARTIES**

4. Plaintiff Shanice Smith is an individual residing in Windsor, Connecticut.

5. Defendant City of Hartford is a municipal corporation organized under the laws of the State of Connecticut, with principal offices at 550 Main Street, Hartford, Connecticut. At all relevant times, the city was Plaintiff's employer.

6. Defendant Cecelia Drayton was, at all relevant times, the City's Director of Sustainability and Plaintiff's direct supervisor. She exercised supervisory authority over Plaintiff, directed Plaintiff's duties, participated personally in the conduct alleged herein, and acted within the scope of her employment and under color of municipal authority.

## **FACTUAL ALLEGATIONS**

7. Plaintiff was hired by the City as a Sustainability Development Associate and began full-time employment in November 2025.

8. Plaintiff's agreed salary was approximately $66,000 plus benefits.

9. Plaintiff worked in the Mayor's Office and was assigned duties involving a USDA-funded grant program referred to in the City's records as the "CFSI" grant.

10. Plaintiff's position was presented to her as a grant-funded position connected to continuing federal grant work, and she accepted the position after discussions with Defendant Drayton regarding the availability and security of funding.

11. As part of her job, Plaintiff worked on grant administration, including budget tracking, reimbursement support, performance-reporting issues, and communications concerning deliverables and personnel hours.

12. By December 2025, Plaintiff identified multiple discrepancies and irregularities in the manner in which the grant budget, personnel line items, and reimbursement materials were being handled.

13. On or about December 17, 2025, Defendant Drayton instructed the Plaintiff to prepare and submit bi-annual reimbursement reports prior to the end of the month. Plaintiff expressed concern with submitting the reports prior to the close of the reporting period, but Defendant Drayton insisted that Plaintiff prepare and submit the reports early so as to avoid any additional scrutiny.

14. Plaintiff then further explained to Drayton that the grant award language appeared to require semiannual reports to be submitted thirty days after the reporting period ending June 30 and December 31, and Plaintiff urged that the City should not submit inaccurate or premature reporting merely to accelerate the process.

15. On December 18, 2025, Drayton again approached the Plaintiff insisting on the early submission of reimbursement reports. At this time Drayton further insisted that the Plaintiff include salary line-item costs which the Plaintiff did not feel were accurate.

16. On or about December 19, 2025, Plaintiff emailed Drayton stating that the City's budget-tracking tool showed two-personnel line items for the project and that Plaintiff was unclear how to include her salary in the reimbursement request unless she was represented in the budget as the Project Manager.

17. Also on December 19, 2025, Defendant Drayton met with the Plaintiff to clarify the questions and concerns Plaintiff raised in her email. At this time, Drayton departed from standard practice and refused to record the meeting with Plaintiff. Instead, Drayton insisted that two other employees attend as witnesses for the discussion. At this meeting Defendant Drayton attempted to explain the discrepancies in the line-item figures she wanted reflected in the report and the City's actual spending on the items. Drayton further stated that she was unable to adjust or update any figures based on actual spending as opposed to the proposed budget.

18. Plaintiff's concerns were not limited to internal workplace preferences. Plaintiff was specifically objecting to what she reasonably believed would be inaccurate or misleading representations in materials used to obtain or justify reimbursement and approval under a federally funded grant.

19. Drayton responded that the USDA had requested reports by the end of December and instructed Plaintiff that she was "not at liberty" to disregard or modify that directive.

20. Drayton also told Plaintiff that concerns should be addressed internally before speaking with grant partners and accused Plaintiff of engaging in "miscommunication" with the partner organization.

21. On information and belief, Plaintiff reasonably understood Drayton's instructions to mean that Plaintiff was expected to process, support, or remain silent about reimbursement and reporting entries that Plaintiff believed were inaccurate, misleading, or unsupported by the grant award language and budget structure.

22. Drayton thereafter sent a follow-up email on or about December 19, 2025, stating that Plaintiff's salary was "represented" within the Project Manager line item even though Plaintiff was not hired as a Project Manager, and further asserting that the City could not change the externally reported budget line items.

23. The December 19th email is significant because it tied Plaintiff's actual salary, role classification, and the Project Manager line item together in a manner Plaintiff believed was inaccurate and potentially fraudulent as to the federal grant.

24. On information and belief, the City thereafter began creating a paper trail intended to characterize Plaintiff's protected objections as communication or performance issues rather than as lawful opposition to suspected misuse or misreporting of federal funds.

25. On or about December 19, 2025, Plaintiff escalated her concerns to City Chief Operating Officer Olusegun Ajayi and reported that she was having serious problems with the budget handling and with Drayton's directives. During this time Plaintiff requested guidance from the Finance Department and the City of Hartford Grants Office so that she could input all necessary information into the reports.

26. Plaintiff also sent follow-up written communication to the COO indicating that the discussion with Drayton had not resolved her concerns.

27. Plaintiff continued to raise concerns regarding the legality and accuracy of the proposed reporting and reimbursement submissions. During the week of December 22nd through

December 26th, Plaintiff prepared the reports that Defendant Drayton requested and left them on Drayton's desk since she was away from the office.

28. On January 5, 2026, Plaintiff was again directed to work on a line-item budget and reimbursement-related submission.

29. In connection with that assignment, Plaintiff identified additional concerns regarding what should be billed to the grant and how fringe benefits and personnel items were being categorized.

30. On the same day, Plaintiff went to Human Resources and reported that she was being asked to do something she was not comfortable doing because the numbers and categories were incorrect and because no one would correct the underlying budget and billing inconsistencies.

31. Plaintiff's report to HR was a further report to a public body of suspected violations of law, unlawful financial misreporting, and municipal mismanagement.

32. Later that same day, Plaintiff was summoned to a meeting with Drayton and HR.

33. At that meeting, Drayton informed Plaintiff that it was an "official separation meeting" and that Plaintiff's employment was terminated effective immediately.

34. When Plaintiff asked for the reason, Drayton initially stated that the separation was based on performance.

35. However, when another HR representative joined the meeting, Plaintiff was told that the separation was not about performance and that her services were simply no longer needed.

36. Plaintiff was given no meaningful advance warning, no performance-improvement process, and no legitimate nonretaliatory explanation consistent with the City's own shifting statements.

37. A City termination letter signed by the COO confirmed that Plaintiff's services were "no longer needed" and that her employment was terminated effective by the close of business on January 5, 2026.

5

38. The City's personnel-action proof likewise reflects an administrative separation entered effective January 5, 2026.

39. The extremely close temporal relationship between Plaintiff's reports to the COO and HR concerning suspected illegality and the City's decision to terminate her supports a strong inference of retaliation.

40. Defendant Drayton personally participated in the retaliatory acts by directing Plaintiff's work, responding to Plaintiff's protected objections, reframing those objections as communication or role issues, escalating the matter internally, and then participating in the termination meeting.

41. As a direct and proximate result of Defendants' conduct, Plaintiff lost her job, income, benefits, and future employment opportunities, and suffered emotional distress, humiliation, and damage to her professional reputation.

**COUNT ONE**

**RETALIATION UNDER THE FALSE CLAIMS ACT**

42. Plaintiff repeats and realleges Paragraphs 1 through 41 as if fully set forth herein.

43. The False Claims Act prohibits an employer from discharging, demoting, suspending, threatening, harassing, or otherwise discriminating against an employee because of lawful acts done in furtherance of an FCA action or other efforts to stop one or more violations of the FCA.

44. Plaintiff engaged in protected activity under the FCA by objecting to, investigating, and attempting to stop what she reasonably believed would be false or misleading reimbursement requests, certifications, budget representations, and related grant-reporting submissions involving federal funds.

45. Plaintiff's protected conduct included, among other things, challenging the inclusion and representation of personnel costs, questioning the equivalence between her role and the Project Manager line item, objecting to inaccurate or unsupported budget and reimbursement classifications, invoking the award language governing reporting deadlines, and reporting her concerns to City officials including the COO and HR.

46. The city, acting through Drayton and other supervisory officials, knew of Plaintiff's protected activity because Plaintiff communicated those concerns directly to Drayton, to the COO, and to HR.

47. The city retaliated against Plaintiff because of that protected activity by escalating scrutiny, reframing her objections as insubordination or communication deficiencies, and terminating her employment on January 5, 2026, immediately after her protected report to HR and shortly after her report to the COO.

48. As a direct and proximate result of the City's retaliation, Plaintiff suffered lost wages, lost benefits, front-pay or reinstatement damages, emotional distress, special damages, and attorneys' fees and costs as authorized by law.

## COUNT TWO
## CONNECTICUT WHISTLEBLOWER RETALIATION

49. Plaintiff repeats and realleges Paragraphs 1 through 48 as if fully set forth herein.

50. At all relevant times, the city was an "employer" within the meaning of Conn. Gen. Stat. § 31-51m, and the city and its officers were public bodies or employees of a public body within the meaning of that statute.

51. Plaintiff reported, verbally and in writing, suspected violations of federal law, federal grant conditions, municipal mismanagement, and abuse of authority to public bodies, including the City's COO and HR officials.

52. Plaintiff also reported conduct that she reasonably believed involved the inaccurate or unlawful handling of federally funded reimbursement materials, budget entries, and grant reporting.

53. The City discharged Plaintiff because she made those reports and because she refused to remain silent about suspected illegality and mismanagement.

54. The City's retaliation violated Conn. Gen. Stat. § 31-51m.

55. Plaintiff has exhausted all available administrative remedies, or no such remedies were available to her, and this action is brought within the applicable statutory period.

7

56. As a direct and proximate result of the City's retaliatory conduct, Plaintiff suffered loss of employment, back pay, lost benefits, and other compensable damages, together with attorneys' fees and costs as permitted by statute.

## COUNT THREE
## WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

57. Plaintiff repeats and realleges Paragraphs 1 through 56 as if fully set forth herein.

58. Connecticut recognizes a cause of action for wrongful discharge where an at-will employee is terminated for a reason that violates an important public policy.

59. Connecticut and federal public policy strongly favor truthful accounting for public funds, truthful statements in claims for federal reimbursement or approval, lawful use of municipal and federal grant money, and protection for employees who refuse to participate in unlawful conduct or who report suspected illegality to public officials.

60. Plaintiff was terminated because she objected to, refused to facilitate, and reported what she reasonably believed to be unlawful or misleading conduct involving federally funded grant reimbursements and reporting.

61. Terminating Plaintiff for that reason violated clearly articulated public policy and was wrongful under Connecticut common law.

62. As a direct and proximate result of that wrongful discharge, Plaintiff suffered lost wages, lost benefits, reputational harm, emotional distress, and other damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Shanice Smith respectfully requests that this Court enter a judgment providing for the following relief:

a.) Back pay, lost benefits, and all other lost compensation;

b.) Front pay or, alternatively, reinstatement to the same or a comparable position;

c.) Compensatory damages, including damages for emotional distress were available;

d.) Special damages and all relief necessary to make Plaintiff whole under 31 U.S.C. § 3730(h);

e.) Attorneys' fees, costs, and interest as allowed by law;

f.) Such declaratory and equitable relief as the Court deems just and proper; and

g.) Such other and further relief as the Court deems appropriate.

## **JURY TRIAL DEMANDED**

Plaintiff hereby requests a jury trial on all triable issues of fact raised by his Complaint.

Respectfully submitted,

Plaintiff Shanice Smith

By: /s/ Patrick Jennings (ct31677)

The Ment Law Group

225 Asylum Street, 15th Floor

Hartford, CT 06103

Tel. (860) 969-3200

Fax. (860) 969-3210

E-mail: PJennings@mentlaw.com

9